**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **DAVID BENNETT,** | Case No.: 11-CV-6403 YGR |
| Plaintiff, | **ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| **CITY AND COUNTY OF SAN FRANCISCO, (GENERAL SERVICES AGENCY, -- REAL ESTATE DIVISION),** | |
| Defendant. | |

Plaintiff David Bennett brought the instant lawsuit against his former employer Defendant City and County of San Francisco ("the City") for allegedly terminating him because he is African-American and was active in his union. Bennett's First Amended Complaint sets forth two claims arising under 42 U.S.C. § 1981: (1) race and color discrimination, and (2) retaliation. (Dkt. No. 22.) In the motion at bar, the City seeks summary judgment on both claims. (Dkt. No. 44 ("Motion").) The Motion is fully briefed. (Dkt. Nos. 57 ("Opposition"), 62 ("Reply").)[1] Having carefully reviewed the record and the arguments of the parties, the Court determines that Bennett has failed to present competent evidence that raises a triable issue of material fact, and that the City is entitled to judgment as a matter of law. Accordingly, for the reasons set forth herein, the Court **GRANTS** the City's Motion.

---

[1] The Court vacated oral argument on this motion pursuant to Civil Local Rule 7-1(b). (Dkt. No. 63).

## I. FACTUAL AND PROCEDURAL BACKGROUND

The following facts are undisputed unless identified otherwise. Plaintiff David Bennett is of African-American ancestry. The City hired Bennett as a full-time permanent employee in late 1988 or early 1989.[2] Bennett's job designation was "2708," that is, a custodian at San Francisco's War Memorial Performing Arts Center. His job duties included sweeping, mopping, dusting, gathering trash bins, and the like.

Bennett occupied that role for twenty years, during which time he received at least fourteen disciplinary suspensions.[3] (Dkt. No. 48 ("Wood Decl.") ¶¶ 5, Ex. A.) Bennett contests the City's motivation for taking these disciplinary actions but not the fact that they occurred, describing them as a "reign of terror" directed against him personally. (Dkt. No. 58 ("Bennett Decl.") ¶ 3.) The City's stated bases for the suspensions included: "AWOL" (taking vacation time which had been denied); "Mistreatment of Persons" (racial slurs, sexist statements, profanity, and aggressive confrontations); "Insubordination" (e.g., refusing to attend safety meetings, refusing to accept

---

[2] The City represents that Bennett's employment began February 4, 1989 (Motion at 4); Bennett testified to the same at his deposition (Dkt. No. 45 ("Super Decl."), Exs. A & B (together, "Bennett Dep.") at 27:7-10); but his Opposition reports a start date of December 23, 1988 (Opp'n at 5). The discrepancy is immaterial to the outcome of the Motion.

[3] The City suspended Bennett: (1) on November 27, 1989, for 3 days; (2) on September 3, 1991, for 20 days; (3) on October 14, 1992, for 30 days, which was reduced to 5 days after Bennett's representative protested; (4) on May 19, 1997, for 2 days; (5) on March 10, 1998, for 2 days; (6) on January 4, 2000, for 30 days; (7) on February 14, 2003, for 2 days; (8) on August 11, 2003, for 3 days; (9) on August 22, 2003, for 5 days; (10) again on August 22, 2003, for 5 days; (11) again on August 22, 2003, for 10 days; (12) on February 18, 2004, for 20 days; (13) on December 9, 2005, for 20 days; (14) on June 19, 2006, for 30 days; and (15) on January 29, 2008, for 30 days. The records of Bennett's purported ninth and tenth suspensions appear to be duplicative, though they may also represent distinct suspensions running concurrently.

The City represents that, in addition to these suspensions, Bennett was reprimanded "dozens" of times. (Motion at 5 (citing Wood Decl. ¶¶ 3, 5; Dkt. No. 47 ("Murray Decl.") ¶ 8).) However, the record evidence cited in support of this representation, Exhibit A to the Wood Declaration, does not evince dozens of reprimands, only numerous communications regarding pending disciplinary actions. The City's cited record indicates one reprimand—the first disciplinary action against Bennett, on June 23, 1989, a few months after he began work ("Leaving work site without permission/Not following published work assignment schedule"). (Wood Dec., Ex. A at 1.)

verbal or written communications from his supervisor); "Inattention to Duties"; "Violence in the Workplace"; "Unprofessional Conduct"; and "Violation of City and War Memorial Policies." (Wood Decl. ¶ 5, Ex. A; Murray Decl. ¶ 8.)

In addition to suspending Bennett, the City also terminated Bennett's employment in February 2000, and again in October 2006. Both times, Bennett's union, the Service Employees International Union, Local 790, grieved his termination and prevailed in arbitration, resulting in Bennett's reinstatement with back pay. The first termination arose from alleged mistreatment of persons, in the form of alleged sexist slurs directed at a female supervisor, and alleged workplace violence, in the form of alleged intimidation of that supervisor. The arbitrator found that Bennett had indeed used the sexist language alleged, but that he did so while off-duty, and that the allegedly intimidating conduct, though it occurred, did not rise to the level of workplace violence. The arbitrator accordingly sustained Bennett's grievance and ordered his reinstatement with back pay. The arbitrator's opinion makes no mention of alleged race discrimination or retaliation. (Murray Decl., Ex. A.)

The City's second termination of Bennett arose from alleged insubordination, in that Bennett allegedly disobeyed a supervisor's direct order to sweep daily at one o'clock around the War Memorial. The arbitrator determined that the order was both insufficiently clear and insufficiently documented to support a just cause finding, and ordered Bennett reinstated with back pay. Like the opinion in Bennett's first arbitration, the second arbitrator's opinion makes no mention of alleged race discrimination or retaliation. (Murray Decl., Ex. B.)

Bennett's third and final termination, which is the action challenged in this litigation, came on December 18, 2009. The City's stated bases for the third termination were five incidents occurring between September 15 and November 14, 2009, which gave rise to seven charges against Bennett: (1) insubordination, (2) failure to follow rules and regulations, (3) mistreatment of persons, (4) violence in the workplace, (5) rude, argumentative, and unprofessional behavior, (6) violations of policies and procedures, and (7) conduct unbecoming of a city employee. (Dkt. No. 50 ("Brown Decl.") ¶ 9, Ex. B (Notice of Intent to Recommend Dismissal ("Notice of Intent")), Ex. C (*Skelly* Meeting Report and Recommendation ("*Skelly* Report")).

The City's documents describe the five incidents purportedly underlying the charges against Bennett.[4] The first incident allegedly occurred when Bennett came to work on his scheduled day off, was found "cursing and complaining because someone had filled the cardboard bin with garbage," and, later, after attempting to enter the Opera House stage door without an identification, rebuffed a security guard's request for him to sign in by saying: "I do not sign in! You bitch little girl!" and "I enter this fucking place whenever I want to and you or that pencil neck or those white trash you are in bed with are not going to tell me what the fuck to do." (Notice of Intent at 3.) The second incident allegedly consisted of Bennett being found on the work site on his day off by a security guard whom Bennett taunted as a "little girl" when the security guard turned on the lights. (*Id.* at 4.) The third incident allegedly consisted of Bennett notifying a non-supervisor about an issue with recycling bins and Bennett saying, when that person told Bennett to address the issue with his supervisor, that he "didn't talk to idiots." (*Id.* at 5.) The fourth incident allegedly consisted of an encounter between Bennett and the Director of the Veterans Trophy Room, in which Bennett, described as being on the work site on an off-day, and in an area prohibited to him,[5] pushed away the Director's hand when the Director attempted to remove some papers from chairs that Bennett was (allegedly without authorization) assisting the Director with moving. (*Id.* at 5-6.) The fifth incident, which allegedly occurred after the Notice of Intent issued, allegedly consisted of Bennett being found at the work site several hours after his shift ended. (*Skelly* Report at 3.)

After notifying Bennett of its intent to terminate him, the City held a *Skelly*[6] hearing at which the *Skelly* officer recommended sustaining the charges against Bennett and recommended his

---

[4] The Court recounts the five alleged incidents because they supply the City's allegedly pretextual reasons for terminating Bennett. The Court does not accept the City's written accounts of those incidents—which include hearsay, speculation, and opinion—as definitive accounts of what *actually* transpired. Their import for the present motion is that they articulate the City's stated reasons for dismissal.

[5] The City presents uncontroverted evidence that Bennett had been specifically directed to refrain from entering the second floor of the Veterans Building, where the fourth alleged incident took place, or from interacting with persons there. (Dkt. No. 53 ¶ 16, Ex. F.)

[6] In *Skelly v. State Personnel Board*, 15 Cal. 3d 194 (Cal. 1975), the California Supreme Court recognized a property interest in a "permanent" public employee's expectancy of continued

4

dismissal. (*Skelly* Report at 6, 11-12.) The City Administrator approved the recommendation and finalized Bennett's termination on December 17, 2009. (*Id.* at 1.)

Bennett's union grieved Bennett's third termination on January 6, 2010. (Dkt. No. 46 ¶ 17, Ex. G ("Grievance"); Dkt. No. 49 ¶ 10.) The Grievance characterizes Bennett's termination as "retaliation for Union activity," and notes both Bennett's role as a Union Steward and his past willingness to avail himself of union protections. The Grievance makes no mention of race discrimination. Ultimately, the merits of the Grievance never advanced to arbitration: the City denied it as untimely under a provision in the governing collective bargaining agreement allotting fifteen days for the filing of grievances. (Dkt. No. 49 ¶ 11-13.)

On December 19, 2011, Bennett filed the instant lawsuit, asserting two claims against the City under 42 U.S.C. § 1981 (race discrimination and retaliation). On June 6, 2012, the Court granted the City's motion to dismiss Bennett's initial complaint on the ground that Bennett, while proceeding under Section 1981's prohibition against impeding contractual relations on the basis of race, had failed to allege any employment contract between the City and himself. The Court granted Bennett leave to amend and Bennett filed an amended complaint on July 2, 2012. The City answered on July 19, 2012, and filed the instant motion for summary judgment on June 4, 2013.

## II. LEGAL STANDARD

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings, depositions, discovery responses, and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Material facts are those that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for

---

employment, and held that such employees may not be terminated without due process consisting of at least "notice of the proposed action, the reasons therefor, a copy of the charges and materials upon which the action is based, and the right to respond, either orally or in writing, to the authority initially imposing discipline." *Id.* at 215.

summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247-48 (dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party).

On an issue where the non-moving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the non-moving party's case. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). If the moving party meets its initial burden, the opposing party must then set out "specific facts" showing a genuine issue for trial in order to defeat the motion. *Id.* (quoting *Anderson*, 477 U.S. at 250). The opposing party's evidence must be "significantly probative," not "merely colorable." *Id.* at 249-50. Further, that party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence that shows there is a genuine issue of material fact for trial. *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000); *Nelson v. Pima Cmty. College Dist.*, 83 F.3d 1075, 1081-1082 (9th Cir. 1996) ("mere allegation and speculation do not create a factual dispute"); *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 922 (9th Cir. 2001) ("conclusory allegations unsupported by factual data are insufficient to defeat [a] summary judgment motion").

When deciding a summary judgment motion, a court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255; *Hunt v. City of Los Angeles*, 638 F.3d 703, 709 (9th Cir. 2011). However, in determining whether to grant or deny summary judgment, it is not a court's task "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (internal quotations omitted). Rather, a court is entitled to "rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment." *See id.*; *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001) ("The district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found.")

///

///

## III. DISCUSSION

The only action Bennett challenges in this litigation is his December 18, 2009 termination. (Opp'n at 9-10.) Bennett's legal theory, in sum, is that the only explanation for his termination, and indeed his extensive discipline history, is racial discrimination. He avers that he has "at all times during his lengthy employment performed all of his assigned and related duties in an excellent manner . . . ." (Opp'n at 9.) He contends that he was "singled out" for discipline because of his race and color and states that none of his fellow employees who are "non-Black" received similar alleged "mistreatment." (Opp'n at 12; Bennett Decl. ¶ 11.)

The Court recognizes that Bennett may actually believe that he has been persecuted in the manner alleged. He argues in his opposition that he has "clearly" and "easily" satisfied his burden. (Opp'n at 12.) However, argument lacking in evidentiary support, as here, does not persuade. Courts evaluate Section 1981 employment discrimination claims under the familiar burden-shifting framework *of McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Surrell v. California Water Serv. Co.*, 518 F.3d 1097, 1105 (9th Cir. 2008). Under this framework, Bennett, as a threshold matter, must make a prima facie showing with respect to both his race discrimination and retaliation claims. *Id.* at 1107-08. The degree of proof required to make a prima facie showing in opposition to a motion for summary judgment is "minimal and does not even need to rise to the level of a preponderance of the evidence." *Raad*, 323 F.3d at 1196 (quoting *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994)). "The plaintiff need only offer evidence which gives rise to an inference of unlawful discrimination." *Id.* If Bennett were to succeed in making this showing, the burden would then shift to the City "to articulate a legitimate, nondiscriminatory reason for its allegedly discriminatory or retaliatory conduct." *Surrell*, 518 F.3d at 1106. If the City articulates a legitimate reason for its action, Bennett must then "offer evidence that [the City's] proffered nondiscriminatory reason is merely a pretext for discrimination." *Id.*

Here, Bennett asserts two claims under Section 1981—race discrimination and retaliation. The Court discusses the claims in parallel because Bennett's evidentiary showing in support of both claims suffers from the same fatal defects. Normally, the Court would analyze whether Bennett made the required prima facie showings. In this instance, the Court may pass over that analysis

because, even if the Court assumes arguendo that Bennett's evidence constitutes a sufficient prima facie showing for both claims[7], Bennett has failed patently to demonstrate that the City's proffered reasons for dismissing him were pretextual.

Within the *McDonnell-Douglas* framework, once a plaintiff establishes a prima facie case, the defendant's burden is merely to articulate legitimate, nondiscriminatory reasons for its actions, supported by competent evidence. *See Beck v. United Food & Commercial Workers Union, Local 99,* 506 F.3d 874, 883 (9th Cir. 2007); *Chuang v. Univ. of California Davis, Bd. of Trustees*, 225 F.3d 1115, 1127 (9th Cir. 2000); *Washington v. Garrett*, 10 F.3d 1421, 1433 (9th Cir. 1993). The City has done so here, providing considerable evidence of nondiscriminatory reasons to dismiss Bennett. Indeed, Bennett himself admitted at his deposition to having taken actions of the type for which he had been disciplined and, in some instances, acknowledged having taken the particular actions which the City says led to his dismissal. (Bennett Dep. 156:8-22 (calling co-workers "little girls," generally); 306:9-307:21 (calling security guard involved in second incident "little girl"); 311:17-21 (acknowledging third incident); 160:20-161:10; 291:21-292:7 (acknowledging fourth incident); 167:10-14, Ex. 9 (acknowledging disregard of order to remain off second floor of Veterans Building), 289:1-24 (admitting to presence on second floor of Veterans Building on day of fourth incident); 94:18-95:1 (acknowledging having willfully taken vacation without approval); 340:2-341:10, 342:1-10 (same).) Bennett's own deposition statements supply direct evidence of Bennett's willful insubordination, contemptuous behavior toward his supervisors, and his penchant

---

[7] To establish a prima facie case of race discrimination, Bennett would have to present competent evidence that: (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) he was performing his job duties adequately at the time of the adverse action; and (4) similarly situated persons outside Bennett's protected class were treated more favorably than he (or other circumstances giving rise to an inference of discrimination). *See Surrell*, 518 F.3d at 1105-06; *Fonseca v. Sysco Food Servs. of Arizona, Inc.*, 374 F.3d 840, 847 (9th Cir. 2004); *Raad*, 323 F.3d at 1195.

To establish a prima facie case of retaliation, Bennett would have to present competent evidence that: (1) he engaged in a protected activity; (2) he suffered an adverse employment action; and (3) a causal connection linked the two. *Surrell*, 518 F.3d at 1108 (citing *Bergene v. Salt River Project Agr. Imp. & Power Dist.*, 272 F.3d 1136, 1140-41 (9th Cir. 2001)).

for inappropriate language and conduct directed at co-workers and others. This evidence satisfies the City's burden of articulating a legitimate, non-discriminatory reason for terminating Bennett.

Accordingly, the burden shifts to Bennett to demonstrate that the City's proffered reasons are pretextual. "[A] plaintiff can prove pretext in two ways: (1) indirectly, by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer." *Chuang*, 225 F.3d at 1127 (citing *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220-22 (9th Cir. 1998)).

Here, Bennett presents indirect evidence. It is, however, scant, essentially anecdotal and/or speculative in nature, and does nothing to undermine the City's account. Bennett's entire evidentiary showing consists of three declarations: one submitted by himself, and two by former co-workers David Wasserman and Nancy Snyder. (Dkt. Nos. 59 ("Wasserman Declaration"), 60 ("Snyder Declaration").) The three declarations total eight pages in length.[8] Yet the quantity of evidence Bennett has supplied, scant as it is, is less injurious to his case than is its content. Bennett's own declaration contradicts his deposition testimony, in that he baldly denies each of the four incidents described in the Notice of Intent. (Bennett Decl. ¶¶ 7-10.) As previously noted, Bennett admitted at his deposition to much of the conduct described therein, as well as to specific incidents. (*Compare*, *e.g.*, Bennett Decl. ¶ 9 (denying ever having engaged in the conduct identified in the Notice of Intent as "Incident Number 3 – Rude, Argumentative and Unprofessional Behavior," wherein Bennett allegedly told a non-supervisor that he would not address an issue with his supervisors because he refused to talk to "idiots") *with* Bennett Dep. 311:17-21 ("Q: Then did you say, 'I don't want to tell them because I don't talk to idiots'?; A: That is correct. And I don't.").) Bennett does not explain or even acknowledge the contradiction. In light of that failure, the Court finds that, to the extent that Bennett's declaration contradicts his deposition testimony, it is a sham

---

[8] Bennett's exclusive reliance on these declarations, in light of the parties' full opportunity to take discovery, Bennett's having been deposed at least twice (*see* Super Decl., Exs. A, B), and declarant Wasserman's also having been deposed (*see id.*, Ex. E ("Wasserman Dep.")), underscores the lack of evidentiary support for plaintiff's claims.

9

declaration, and may be disregarded. *Nelson v. City of Davis*, 571 F.3d 924, 927 (9th Cir. 2009); *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266-67 (9th Cir. 1991).

To the extent that Bennett's declaration does not contradict his prior deposition testimony, the Court finds that it is insufficient to generate a triable issue of fact. "A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact." *F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997); *see also*, *e.g.*, *Arpin*, 261 F.3d at 922 (in excessive force case, plaintiff's "conclusory statement that she 'did not resist arrest in any way'" insufficient to raise triable issue of fact). Here, Bennett's declaration consists of nothing more than generalized denials of wrongdoing, recitations of immaterial and/or undisputed facts, and unsupported accusations against the City. It entirely fails to supply specific evidence suggestive of a discriminatory intent by the City, beyond Bennett's own subjective impressions and speculation. (*E.g.*, Bennett Decl. ¶¶ 3 (characterizing the City's prior disciplinary action as a "reign of terror"; 4 (baldly asserting that he "had always performed all of [his] assigned and related duties in an excellent manner" and complied with applicable rules); 11 ("Throughout my employment, I was subjected to a continuing pattern of unlawful discriminatory employment actions as reflected above.").) Bennett offers no specifics to substantiate the conclusions proffered in his declaration. However, to survive summary judgment Bennett must "respond with something more than conclusory allegations, speculation, or argumentative assertions that [the City's] stated reasons are pretextual." *Allen-Bell v. Montgomery Ward Credit Corp.*, 194 F.3d 1316 (9th Cir. 1999). He has failed to do so.

The two-page Wasserman Declaration fares no better. It consists of opinion and speculation, rather than direct observations of fact. Wasserman declares that he has "never known" Bennett to engage in the conduct charged against him, that Bennett had been "singled out and targeted," and that Wasserman "believe[s] race was a primary factor in connection with" Bennett's purported treatment. (Wasserman Decl. ¶¶ 4, 6.) However, the declaration fails to provide sufficient foundation for Wasserman's opinions, or any specifics that support their conclusions. Wasserman was hired in September 1997 as a Building Grounds Patrol Officer. (Wasserman Decl. ¶ 1.) The mere fact that Wasserman and Bennett both worked at the War Memorial Building does

not mean that Wasserman was in a position to form lay opinions which satisfy an evidentiary threshold. *See* Fed. R. Evid. 701 (lay opinion testimony must be, among other things, "rationally based on the witness's perception"). Wasserman opines that Bennett was "never" insubordinate, "never" mistreated other persons, "never" rude. (Wasserman Decl. ¶ 4.) How Wasserman would have a basis for knowing what Bennett did, or for that matter what happened to Bennett, when Bennett was outside Wasserman's presence is never explained.

To the contrary, in his deposition, Wasserman testified that he had "not seen Mr. Bennett harassed by management or supervisors" or by anyone else. (Wasserman Dep. at 49:24-50:5.) At best, he was called on the scene *after* security asked Bennett to leave the building on a particular occasion and called the police for assistance. (Wasserman Dep. at 50:3-53:3.) He then formed an opinion that Bennett was harassed and suffered discrimination but readily admitted that he had no personal knowledge of the events which preceded the encounter he witnessed. (Wasserman Dep. at 54:11-59:19.)[9]

> Based on my experiences with Mr. Bennett or over those seven years of being on call as I described and witnessing him work and interacting with him during the time that I was working with him, my observations with—of him was that he did his job; he interacted with all the people that worked in that facility in a professional manner; was not hostile; exhibited no extreme behavior, or violent behavior; and any comments made about him—whether or not he should be in the building or not in the building or watch him or anything like that—seemed to be out of place; discriminatory; and potentially prejudicial.
> * * *
> [T]here had to be some prejudice involved of some sort[.]
> * * *
> I either think it's a racial matter, or I think it's a matter of him rising up against the criticism and them not liking it[.]
> * * *
> I'll admit -- I'll say this clearly that I cannot directly prove that, but I can say it's an assumption of mine that it was true.

(Wasserman Dep. at 65:10-23, 66:22-23, 66:25-67:3, 68:6-9.)

In light of Wasserman's own deposition testimony, the vague, conclusory opinions proffered in his declaration opposing summary judgment cannot create or change the foundation for his

---

[9] Wasserman also expressed an opinion about a specific event that occurred in 1997 and purportedly showed that Bennett had been "singled out," but that event does not bear ultimately on the findings in this case. (Wasserman Dep. at 60:2-63:22.)

11

opinions, which, here, are merely speculative.[10]  Fed. R. Evid. 602.  Neither does Wasserman's declaration supplement the record with  any indicia of how often Wasserman observed Bennett, nor any ground to suppose that Wasserman was aware of the nature and extent of Bennett's job, including any direct orders given to Bennett out of Wasserman's presence.  As such, Wasserman's opinions do not create a triable issue of material fact *Id.*; *see also* Fed. R. Civ. P. 56(c)(4) (declarations used to oppose summary judgment must "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated").  "Conclusory statements without factual support are insufficient to defeat a motion for summary judgment." *Surrell*, 518 F.3d at 1103 (citing *Nat'l Steel Corp. v. Golden Eagle Ins. Corp.*, 121 F.3d 496, 502 (9th Cir. 1997)); *see also Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

Plaintiff's last proffer of evidence, the Snyder Declaration, consisting of two pages, merely relates an anecdote from 1999, involving parties who were not involved in Bennett's 2009 termination, and is of questionable relevance.  Taking Snyder's declaration at face value, Snyder relates that Greg Ridenour, an Assistant Manager, told Richard Russell, the Custodial Director, "that there was 'another incident' and that 'Bennett pushed Beth.'"  (Snyder Decl. ¶ 4.)  To this Snyder responded, "'No[,] he didn't[;] I was right there and he didn't do anything.'"  (Snyder Decl. ¶ 5.)  Snyder then declares, in a succession of speculative and hearsay statements, that Ridenour "attempted to influence" an unnamed "receptionist" to trump up a charge against Bennett, telling her that "they could make her testify."  (Snyder Decl. ¶ 6.)  Notably, Snyder declares nothing about a racial or retaliatory motivation for the purported action against Bennett; she merely identifies the incident as "demonstrat[ing] the inequity of working at the War Memorial."  (Snyder Decl. ¶ 7.)  Consequently, the declaration provides little probative value and fails to raise a triable issue of fact.

---

[10] *See also* Wasserman Dep. at 95:14-17; 96:3-5 ("My understanding of the lawsuit initially was it was a [sic] attack against him personally, not involving race or anything else, just him, the individual. . . .  I thought that [race] was not—it was not the focus.  I didn't think of it as an issue . . . .").  Wasserman is silent in his declaration and the deposition testimony cited to the Court as to the issue of union retaliation.

United States District Court
Northern District of California

Based upon the record provided, Bennett has failed to raise a triable issue of fact that the City's stated reasons for terminating him were merely a pretext for unlawful discrimination or retaliation. Accordingly, the City is entitled to judgment as a matter of law on both of Bennett's Section 1981 claims. *See Anderson*, 477 U.S. at 252.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** the Motion for Summary Judgment of Defendant City and County of San Francisco. The Court further **ORDERS** the City to submit a proposed form of judgment consistent with this Order within five business days from the date of this Order. The Court hereby **SETS** a compliance hearing for its 9:01 a.m. calendar on **Friday, January 24, 2014**. If the City has timely submitted a compliant proposed form of order, the compliance hearing will be vacated and no appearance shall be required.

This Order terminates Docket No. 44.

**IT IS SO ORDERED**.

Date: January 13, 2014

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**